UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KEVIN LEE MCLYMOND,

                                Plaintiff            DECISION AND ORDER

-vs-
                                                     16-CV-6180 CJS

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                                Defendant.

_____


APPEARANCES

For the Plaintiff:          Elizabeth A. Huangs
                            Kenneth R. Hiller
                            Law Offices of Kenneth Hiller
                            60000 North Bailey Avenue, Suite 1A
                            Amherst, New York 14226

For the Defendant:          Sergei Aden
                            Social Security Administration
                            Office of General Counsel
                            26 Federal Plaza, Room 3904
                            New York, New York 10278

                            Kathryn L. Smith, A.U.S.A.
                            Office of the United States Attorney
                            for the Western District of New York
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied the application of Kevin McLymond ("Plaintiff") for Disability Insurance Benefits ("SSDI").  Now before the Court is Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings and Defendant's cross-motion [#12] for judgment on the pleadings.  Plaintiff's application is denied and Defendant's application is granted.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Court has reviewed the administrative record [#6] and will offer only a brief summary of the facts pertinent to the arguments raised by Plaintiff.

Plaintiff has a college education and, prior to 2001, had worked for twenty years at a commercial printing establishment as a "pre-press operator"/graphic artist, which was performed at the sedentary exertional level. (51-52; 64 "It was all computer work."; 65 "I was sitting at a computer."; 66-69).[1]  Between 2001 and 2011, Plaintiff worked on a part-time basis as a painter, which, is classified as medium work, and as a landscaper/gardener, which is classified as heavy work. (48-50, 55, 63-64).  In 2004, 2007, 2008 and 2009, and 2011, Plaintiff had reported earnings of less than five thousand dollars per year. (169-170).  In 2010, Plaintiff had no reported earnings. (169).

---

[1]Unless otherwise noted, citations are to the administrative record, Docket No. [#6].

Plaintiff has a number of health problems, including history of deep vein thrombosis ("DVT") and pulmonary embolism ("PE"), high blood pressure, high cholesterol, and degenerative disc disease of the lumbar and cervical spines.

On September 10, 2010, Plaintiff told his primary care physician, Michael Myers, M.D. ("Myers"), that he was having symptoms suggestive of carpal tunnel syndrome, after "moving a lot of furniture for both himself and for other people." (304).

On September 15, 2010, neurologist Anne Moss, M.D. ("Moss") reported that Plaintiff was complaining of "bilateral hand numbness and tingling." (265). Moss performed nerve conduction studies, the results of which were "normal." (265).

On February 5, 2011, neurologist Ryan Evans, M.D. ("Evans"), reported that Plaintiff was complaining of

> problems with his hands over roughly the last 9 months. He describes numbness, tingling and burning, which affects all fingers of the hands. The hands swell at times. There is also more discrete pain that occurs intermittently in the wrists and some of the finger joints. He has some radiation of pain a short distance into the forearms. . . . [He states that h]is hand strength has decreased and his hands occasionally lock up during prolonged gripping (such as while driving). The symptoms are worse in his right hand than in his left. They are worse after activity and worse at the end of the day.

(258). Upon examination, Evans noted normal muscle tone and "no wasting of hand muscles," with "some dyesthesia" (abnormal sense of touch) "to pinprick across the hands, though no clear sensory loss." (259). Evans expressed uncertainty as to what was causing Plaintiff's symptoms, inasmuch as his nerve conduction testing was negative, and the symptoms did not suggest cervical radiculopathy. (259). Evans prescribed Amitriptyline "for control of [Plaintiff's] neuropathic symptoms." (259). A

month late, on March 9, 2011, Evans reported that Plaintiff's symptoms were "perhaps 80-90% better" after taking Amitriptyline, "with only mild intermittent tingling that is confined to his fingertips." (262).

On November 19, 2012, Karl Eurenius, M.D. ("Eurenius") performed a consultative examination at the Commissioner's request. (467-471). Eurenius noted that Plaintiff's complaints included numbness and tingling in his hands:

> He has also noted, over the past two years, numbness and tingling in his hands. He had nerve conduction studies, which rule out carpal tunnel syndrome, and he is not certain what the cause of this numbness and tingling is, which is worse in his right dominant hand than in his left hand.

(467). Upon examination, Eurenius observed that Plaintiff had full range of motion in his shoulders, elbows, forearms and wrists, no sensory deficits, full strength, and "intact" "hand and finger dexterity." (470). Eurenius opined that due to other medical problems, Plaintiff was "moderately limited" in walking, climbing, bending, lifting, carrying and kneeling. (470). However, Eurenius did not indicate that Plaintiff had any limitations on using his hands, such as for reaching, handling or fingering. (470).

On December 14, 2012, Rochelle Barone RPA-C ("Barone") reported that Plaintiff was complaining again of numbness in his right hand: "He's noticed some numbness and tingling in his right arm for 2 years but over the past 4 days is noted in his right hand. He feels that his strength is limited. Particularly with flexion." (504). Upon examination, Barone found a full range of motion in the right arm, "no demonstrable weakness," "normal reflexes" and "normal muscle tone." (506). Barone indicated that she was not sure whether Plaintiff's symptoms were related to cervical radiculopathy or a nerve impingement in the shoulder, and referred Plaintiff for physical

4

therapy. (507). Barone stated, however, that Plaintiff was not having pain, and therefore did not require pain medication. (507).

On February 21, 2013, physical therapist Julie Flannery, PT ("Flannery") reported: "Neck Pain Overall doing quite a bit better, not having as much tingling down the arm." (645). Flannery stated that Plaintiff's symptoms were "improving," and her assessment was "Good tolerance, overall functioning is improving." (645-646).

On March 7, 2013, Flannery reported that Plaintiff was still having "numbness/tingling in right arm down to thumb/palm," but that his symptoms were "improving." (659).

On May 8, 2013, Dr. Evans reported that Plaintiff was complaining of "hand numbness, right arm pain." (526). Plaintiff indicated that the numbness was constant in his right hand, and intermittent in his left hand. (526). Evans noted that Plaintiff had previously taken Amitriptyline, which had helped the hand symptoms "significantly," but that Plaintiff had stopped taking the medication "at some point," "apparently due to ineffectiveness." (526). (Plaintiff apparently unilaterally stopped taking Amitriptyline at some time between November 2012 and May 2013, because in November 2012, he indicated that he was still taking Amitriptyline. (468)) Upon examination, Plaintiff had full strength despite experiencing some pain from the testing, and some dyesthesia in the right fingers. (527). Evans performed a nerve conduction study, which was "normal," but which did "not rule out the possibility of radiculopathy." (527). Evans indicated that further testing was required to see if Plaintiff's symptoms were caused by "spondylosis in the neck." (527).

Evans subsequently performed MRI testing, which, on May 29, 2013, he stated was indicative of "moderate central and moderate-severe bilateral foraminal narrowing at C4-C5, C5-C6 and C6-C7," though "the [spinal] cord itself looks fine." (532). Regarding Plaintiff's hand symptoms, Evans stated: "Hand numbness is diffuse, but most prominent in the distal 2nd and 3rd fingers bilaterally. The right hand symptoms are almost constant, the left hand is intermittent." (532). Evans opined that the aforementioned foraminal narrowing of the cervical spine was "almost certainly the cause of [Plaintiff's] shoulder/arm pain and hand numbness." (532).[2] Evans noted that since his last appointment with Plaintiff three weeks earlier, Plaintiff "had some more shoulder pain because he did a lot of work digging up sod." (532).

On June 6, 2013, Evans reported that he had conducted EMG testing, with "abnormal" results concerning the right arm: "There is partially compensated chronic denervation in C7 muscles. There is no acute denervation. There is also very mild chronic denervation in C5 and C6 muscles. In summary, the dominant finding is a chronic right C7 radiculopathy." (547). Evans stated, though, that he was unsure whether Plaintiff's hand numbness was related to such findings. (547). Later in the same report, Evans stated: "Given that the exam is benign and there is nothing acute on the EMG, it is worth further conservative therapy. I will have him try PT again. I will also give him a lower dose of gabapentin so he can gradually titrate up." (547).

---

[2]Plaintiff's Memo of Law mis-quotes Dr. Evans on this point three times, by thrice stating that Evans indicated that degenerative changes of the cervical spine were "most certainly" the cause of Plaintiff's symptoms. Pl. Memo of Law [#9-1] at pp. 8, 12 & 13.

On July 3, 2013, Flannery reported that Plaintiff had completed his physical therapy pulling exercise with "no increase in pain," though Plaintiff reportedly stated, "there's always numbness there." (693).

On July 23, 2013, Flannery reported, "right hand is still numb," but noted that Plaintiff's symptoms were "improving." (720). Additionally, Flannery stated, "Good tolerance with treatment, [patient] reports arm/hand feels great, however neck feels stiff after traction." (721). On July 25, 2013, Plaintiff reportedly told Flannery that his arm was "feeling really great" after his last PT session. (727).

On July 30, 2013, Plaintiff reportedly told Flannery that his arm was sore, because he had been sanding something the day before: "Doing ok, arm is sore today, but I was doing sanding yesterday. I guess it's to be expected that when I use it, it's going to be sore/numbish." (731) (Presumably referring to sanding woodwork or drywall).

On November 12, 2013, Plaintiff reportedly told Flannery that he was sore from raking and carrying leaves for more than three hours the previous day: "Also sore from doing 3+ hours of raking and carrying leaves yesterday." (765, 768).

On November 26, 2013, Plaintiff reportedly told Flannery that he was sore from stacking wood the previous day. (779, 782) ("Doing ok, feeling a bit stiff and sore today from stacking wood yesterday.").

On December 3, 2013, Dr. Evans reported that Plaintiff's "hand numbness is unchanged," adding that "[t]he right hand is numb fairly consistently." (589). Plaintiff reported having "more trouble writing." (589). Evans noted that Plaintiff was continuing to receive physical therapy. (589).

On March 4, 2014, Evans again reported that Plaintiff's hand symptoms were "essentially unchanged." (592). Plaintiff reportedly stated that he was having "more trouble writing and using the computer." (592). Evans stated that pinprick testing was "somewhat decreased in the distal palmar aspect of the middle 3 fingers of both hands, fairly symmetric, but otherwise intact in the hands/arms." (593). Evans further stated: "Exam remains benign, but symptoms really have not improved with conservative therapy.[3] I would like him to see a surgeon to discuss possible surgical options for his C-spine disease." (593). Evans referred Plaintiff to James Maxwell, M.D. ("Maxwell"), for a surgical consultation. (593).

On April 9, 2014, Maxwell examined Plaintiff, and noted that Plaintiff was complaining of "constant numbness of hands with bilateral wrist pains radiating up to [the] middle forearms." (595). Plaintiff reportedly stated that the hand numbness was "aggravated at night often with gripping." (595). Maxwell stated, "He likes to be very active, works with his hands a lot but now has difficulty working with his hands because of the numbness of hands." (595). Upon examination, Maxwell found that Plaintiff had full strength. (595). Maxwell indicated that an x-ray showed "degenerative disc spur complexes" and neuroforaminal narrowing in the cervical spine. (595). However, Maxwell opined that Plaintiff's symptoms were most likely due to carpal tunnel syndrome, despite the fact that earlier nerve conduction studies seemed to rule out that condition. (596). Maxwell stated that if the problem was carpal tunnel syndrome, it was "an easy thing to fix" surgically. (596). Maxwell added that if carpal tunnel syndrome

---

[3]This statement is somewhat puzzling, since Flannery consistently reported that Plaintiff's symptoms were improving with physical therapy.

was not to blame, then the cervical spine was the "fall back diagnostic culprit for the tingling in [Plainitiff's] arms." (596). Maxwell stated that if Plaintiff's symptoms were caused by the cervical spine problems, then a "complete fusion of the neck" would be required to fix the situation, though he did not recommend such surgery due to Plaintiff's relatively young age. (596).

On May 14, 2014, Flannery reported that Plaintiff was "[a]ble to complete household/yard chores with decreased pain 50% of the time." (685).

In June 2014, Plaintiff injured his rotator cuff after falling in the shower. On June 27, 2014, during a surgical consultation for that injury, Plaintiff reportedly stated that he was only rarely having numbness in his hands. (869) ("There is rare numbness in his hands due to a cervical spine problem which is chronic [and] followed by Dr. Maxwell.").

PROCEDURAL BACKGROUND

On July 24, 2012, Plaintiff applied for SSDI benefits, claiming to have become disabled from working on March 23, 2012. (158). Plaintiff later amended his disability onset date to November 19, 2011, which correlates to when he injured his lower back while moving a log splitter. (56).

On June 5, 2014, a hearing was conducted before an Administrative Law Judge ("ALJ").[4] Plaintiff appeared with his attorney representative. Plaintiff testified, in pertinent part, that at that time, he could not perform his past work as a graphic artist, because he was able to sit for only about fifteen minutes at a time, and was unable to use a computer because of "numbness in [his] fingers and right hand." (57-58). A

_____

[4]This was approximately seventeen months past Plaintiff's last-insured date for SSDI benefits.

9

vocational expert testified, in pertinent part, that Plaintiff's past work as a graphic artist "require[d] . . . frequent reaching, handling and fingering." (72).

On July 2, 2014, the ALJ issued a written decision denying Plaintiff's claim for benefits. (28-37). The ALJ found that Plaintiff's last-insured date was December 31, 2012. (30). Applying the familiar five-step sequential analysis used for evaluating disability claims, the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in substantial gainful activity since November 19, 2011; that he had severe impairments consisting of "degenerative disc disease of the lumbar spine and cervical spine; cervical radiculopathy; and right knee arthritis"; and that none of those impairments met or medically equaled a listed impairment. (30-32).

The ALJ also noted that Plaintiff had been complaining of "hand numbness and tingling, worse on the right" than on the left, since 2010. (31). The ALJ pointed out, however, that Plaintiff's doctors had difficulty finding a definitive explanation for the hand numbness and tingling, though they suspected those symptoms might be related to Plaintiff's cervical spine radiculopathy. (31-32). The ALJ indicated, therefore, that he considered the hand numbness and tingling to be "non-medically determinable impairment[s]," but would consider those symptoms "in connection with the claimant's severe impairments listed above, particularly those related to his cervical impairments." (32).

The ALJ also found that Plaintiff had non-severe impairments including a history of deep vein thrombosis and pulmonary embolism,[5] hypertension and high cholesterol.

_____

[5]See, Pl. Memo of Law [#9-1] at p. 4 (referring to Plaintiff's chronic Postphlebitic Syndrome).

(31).

Prior to reaching the fourth step of the sequential analysis, the ALJ found that

Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 C.F.R. 404.1567(b)[6] except he could
> lift and carry up to twenty pounds, sit for up to eight hours and stand for
> up to four hours during a workday, and needed [sic] a five minute break
> every hour to change position.

(32).

In making this RFC determination, the ALJ noted, *inter alia*, that Plaintiff was

alleging disability, in part, due to "upper extremity numbness and pain" (33), but that,

"the medical record for the period prior to the date last insured consistently reveals only

modest clinical findings in connection with the claimant's musculoskeletal impairments."

(33).  In that regard, the ALJ noted that in November, 2012, one month prior to

Plaintiff's last-insured date, Dr. Eurenius had found that Plaintiff's

> [d]eep tendon reflexes were physiologic and equal in the upper and lower
> extremities, with no sensory deficits noted and 5/5 strength in the upper
> and lower extremities.  Hand and finger dexterity were also noted to be
> intact, with 5/5 grip strength and negative Tinel sign[7] bilaterally. (Exh.
> 11F).

(34).  The ALJ interpreted Eurenius's report as indicating that Plaintiff had "normal

---

[6]This regulation states in pertinent part that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b) (West 2017).

[7] "Tinel's sign" is defined as "a tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb." Merriam Webster Medical Dictionary, https://www.merriam-webster.com/medical/tinel

strength of the upper and lower extremities, including the hands," and that Plaintiff's "difficulties arise primarily with significant lifting or prolonged standing." (36). The ALJ further found that Eurenius's report was entitled to "significant weight," because it was "well supported by the results of his own examination" and "generally consistent with the substantial evidence of record, including the claimant's own reports." (36).

Concerning the consistency of Eurenius' report with the rest of the medical evidence, the ALJ noted that on December 14, 2012, shortly after Plaintiff was examined by Dr. Eurenius, he was examined by PA Barone, who found that Plaintiff had "full range of motion and no demonstrable weakness of his [right] upper extremity, normal reflexes, and normal muscle tone." (34). The ALJ further indicated that "[j]ust prior to the date last insured, on December 27, 2012, the claimant presented to physical therapist Julie Flannery, DPT, for initial evaluation, with complaints of . . . numbness and tingling in the arms and hands," and that Flannery's "physicial examination found . . . normal reflex and muscle strength, with grossly intact sensation." (34).

The ALJ also discussed the medical evidence relating to the period (2013-2014) after Plaintiff's last-insured date, which the Court has already reviewed above. (34-35). In particular, the ALJ stated:

> Particularly noteworthy are several objective tests and studies undergone by the claimant [after his last-insured date]. A nerve conduction study of the arms done on May 8, 2013, was noted as being completely normal, with no focal neuropathy or polyneuropathy, but did not rule out the possibility of radiculopathy.
>
> ***
>
> Records from neurologist Ryan Evans, M.D., refer to an additional nerve conduction study from June 2013 which showed a partially compensated chronic denervation in the C7 muscles, with no acute denervation, as well

12

as a very mild chronic denervation in C5 and C6 muscles, which were summarized as a dominant finding of chronic right C7 radiculopathy.

These objective tests, done within six months after the date last insured, certainly help confirm the underlying causes of the claimant's symptoms prior to the date last insured. However, this evidence, particularly the relatively modest results of the nerve conduction studies, do not reveal any finding from which to conclude a more significant degree of limitation prior to the date last insured than is already contemplated by the above residual capacity [finding].

(34-35).

Also as part of the ALJ's RFC analysis, he discussed Plaintiff's activities of daily living, stating, in pertinent part:

On January 19, 2012, [Claimant] reported he was shoveling snow, which resulted in lower back pain. On March 1, 2012, it was noted the claimant had traveled to New Orleans for Habitat for Humanity to build a house and upon his return, was feeling left-sided low back pain after hanging drywall for a week.

During the consultative examination, the claimant acknowledged showering and dressing himself daily, going to the library, socializing with friends, cooking five or six times a week and shopping on a weekly basis, but also indicated difficulty with laundry and vacuuming because of back pain. It was noted in April 2013 that the claimant had just come back from a trip to Las Vegas, where he drove to Zion National Park. He reported using a walking stick there, but also acknowledge driving 140 miles. [This is a typographical error; the report actually indicates that he drove 1400 miles (484)] On May 1, 2013, the claimant indicated he had been mulching, raking, and filling barrels. Later that month, the claimant acknowledged digging holes for bushes, after which he was very sore. The claimant also reported, in July 2013, going to Bryce Canyon National Park and, in November 2013, walking and training his dog and raking leaves.

The record, then, shows, that despite his impairments, the claimant has consistently engaged, or sought to engage, in activities requiring a fair degree of physical involvement. While the claimant indeed reported exacerbated symptoms following some of those activities, such as shoveling, digging holes and hanging drywall, those are also activities more physically demanding than the above residual functional capacity. Additionally, the claimant's continued willingness to engage in such activities despite his impairments speaks not only to his history as a very active individual, but also to his own perceptions of his remaining abilities. Indeed, the claimant's own statements to his treating sources indicating he considered himself to be disabled because he was no longer able to hang drywall or [to] paint are revealing. Thus, while the record, including the claimant's pattern of behavior, confirms the claimant's impairments limit him from engaging in some activities as often or as rigorously as he is accustomed to or would like to, it does not show that he is limited beyond the above residual functional capacity.

(35-36) (citations omitted).

At step four of the sequential analysis, the ALJ found that with the foregoing RFC, Plaintiff could still perform his past relevant work as a "graphic designer." (36). Consequently, the ALJ found that Plaintiff is not disabled, and therefore did not proceed to the fifth step of the sequential analysis. Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination.

On March 18, 2016, Plaintiff commenced this action. On October 5, 2016, Plaintiff filed the subject motion [#9] for judgment on the pleadings, and on December 1, 2016, Defendant filed the subject cross-motion [#12] for judgment on the pleadings. On January 24, 2017, Plaintiff filed a reply [#14].

STANDARDS OF LAW

This Court's review of the Commissioner's decision to deny benefits is of limited scope. 42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

> A reviewing court does not determine *de novo* whether a claimant is disabled. Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such evidence is supported by substantial evidence in the record.

*Scott v. Astrue*, No. 10 CIV. 9481 JGK RLE, 2012 WL 1080449, at *7 (S.D.N.Y. Mar. 14, 2012) (citations omittted), report and recommendation adopted, No. 10 CIV. 9481 JGK RLE, 2012 WL 1080406 (S.D.N.Y. Mar. 30, 2012). Consequently, if the Commissioner applies the correct standards and the decision is supported by substantial evidence, "the Commissioner's decision must be upheld, even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ from the Secretary's." *Alves v. Colvin*, No. 13-CV-3898 RPP, 2014 WL 4827886, at *5 (S.D.N.Y. Sept. 29, 2014) (citation omitted).

DISCUSSION

Plaintiff contends that the ALJ erred in various respects, each of which the Court will consider below.

_The RFC Determination_

Plaintiff first maintains that the ALJ's RFC determination is erroneous, because it "failed to account" for the "functional effects" of his cervical radiculopathy, "namely, numbness, tingling, and pain in his hands."[8] Indeed, Plaintiff contends that the ALJ's RFC finding does "not account for" his hand limitations "in any way."[9] On this point, Plaintiff argues that because his cervical radiculopathy is confirmed by objective testing, the ALJ was required to give "great weight" to his subjective complaints about his symptoms.[10]

These arguments lack merit. To begin with, insofar as Plaintiff is contending that the ALJ failed to consider whether he had functional limitations due to the tingling and numbness in his hands, the Court disagrees. The ALJ's decision clearly indicates that he considered this issue. (31-36). Plaintiff's argument on this issue really boils down to an assertion that the ALJ should have accepted his subjective complaints about being

---

[8]Pl. Memo of Law [#9-1] at p. 11. Plaintiff argues that this point is important because "if [he] was unable to use his hands frequently, he would be unable to perform his past relevant work." _Id._ Plaintiff cites to pages 248, 262, 494, 504, 528, 532 and 589 of the administrative record as support for the statement that he has reported "numbness, tingling and pain" in his hands ever since 2010. Pl. Memo of Law [#9-1] at p. 12. (Plaintiff also cites to page "892" of the record, but the record ends at page 876.) The Court observes that most of those citations refer to tingling and numbness, but not pain. Plaintiff did, however, refer to hand pain at other times. (526, 532).

[9]Pl. Memo of Law [#9-1] at p. 13.

[10]See, Pl. Memo of Law [#9-1] at p. 12 ("Plaintiff's longtime subjective complaints of right hand numbness, tingling and pain are directly supported by objective evidence. Therefore, the ALJ should have given great weight to Plaintiff's subjective complaints[.]").

unable to use his hands, and should have included hand limitations in the RFC.

However, Plaintiff's reasoning in this regard -- that the ALJ was required to give "great weight" to his subjective complaints because objective testing confirmed the presence of cervical radiculopathy – misapprehends the relevant law, which is that,

> [w]hen determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).  Moreover, the diagnosis of an underlying condition does not necessarily establish the severity of the claimant's symptoms or the existence of particular limitations. *See, Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. May 28, 2008) ("[M]ere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability.") (citation omitted).

Here, even though there is objective medical evidence that Plaintiff has degenerative changes in the cervical spine, the medical evidence is not clear that such condition is causing the tingling and numbness in Plaintiff's hands.  Indeed, as already discussed, Dr. Maxwell believed that those symptoms were more likely caused by carpal tunnel syndrome. (596).  Nevertheless, the ALJ assumed, for purposes of his decision, that the hand numbness and tingling were related to Plaintiff's "cervical impairments." (32).

More importantly, the ALJ identified substantial evidence of record that regardless of what was causing the tingling and numbness in Plaintiff's hands, such

symptoms did not prevent him from using his hands prior to his last-insured date. The ALJ noted, for example, that just prior to such date, Dr. Eurenius' examination "revealed positive findings only at the right knee and the lower back, with normal examination of the neck, and normal strength of the upper and lower extremities, including the hands." (36, 470).

There are no contrary medical findings in the record. That is, no doctor found that Plaintiff would be unable to perform the frequent reaching, handling and fingering required to perform his past work as a pre-press operator/graphic artist. There is only Plaintiff's subjective testimony, which the ALJ found was inconsistent with the medical record and with Plaintiff's activities of daily living. (34-36). The ALJ's determination in that regard is supported by substantial evidence.

Plaintiff nevertheless maintains that the ALJ erred by stating that EMG testing showed "modest" findings.[11] In this regard, Plaintiff states that the ALJ "substituted his own medical judgment for that of a medical expert."[12] Further, Plaintiff essentially argues that the results of EMG testing could not have been "modest," since Dr. Evans "interpreted the studies" "to support a diagnosis of right C7 radiculopathy."[13]

However, the ALJ's description of the nerve conduction study test results as "relatively modest"[14] is supported by the record. For example, in September, 2010, Dr. Moss reported that nerve conduction studies were "normal." (265). Additionally, Dr.

---

[11]Pl. Memo of Law [#9-1] at p. 13; *see also*, Pl. Reply [#14] at p. 2.

[12]Pl. Memo of Law [#9-1] at p. 13.

[13]Pl. Memo of Law [#9-1] at p. 14.

[14]See, (35) (referring to "the relatively modes results of the nerve conduction studies.").

Evans stated that nerve conduction studies in February, 2011, were "normal" (259), and that nerve conduction studies in May, 2013, were also "normal," but did "not rule out the possibility of radiculopathy." (527). Moreover, although Dr. Evans indicated that EMG testing in June, 2013, was "abnormal" and suggested cervical radiculopathy, he summarized the test results as showing "nothing acute," and as suggesting the need for only "conservative therapy." (547). Accordingly, the ALJ did not commit error, let alone reversible error, by referring to the results of nerve conduction testing results as "relatively modest."

Plaintiff also maintains that the ALJ should not have relied upon Dr. Eurenius's report in making the RFC determination, since Eurenius did not have the results of the tests later performed in 2013 and 2014 (after the last-insured date) when he formulated his opinion.[15]

However, the Court again disagrees. Even assuming *arguendo* that such testing actually pinpointed the underlying causes of Plaintiff's hand symptoms,[16] such testing did not provide any additional information concerning Plaintiff's functional limitations. Moreover, a medical opinion does not become stale merely because it pre-dates other evidence in the record, where, as here, the subsequent evidence does not undermine the opinion. *See, Camille v. Colvin*, 652 Fed.Appx. 25, 28 n. 4, 2016 WL 3391243 (2d Cir. Jun. 15, 2016) ("No case or regulation Camille cites imposes an unqualified rule

---

[15]Pl. Reply [#14] at pp. 3-4.

[16]Plaintiff argues that testing performed after his last-insured date established that his hand symptoms were caused by cervical radiculopathy. Pl. Memo [#9-1] at p. 12. However, as already discussed, Dr. Evans was not entirely certain about that, and Dr. Maxwell felt that Plaintiff's symptoms were more likely due to carpal tunnel syndrome, with cervical radiculopathy being the "fall back diagnostic culprit for the tingling in [Plainitiff's] arms." (596).

that a medical opinion is superseded by additional material in the record, and in this case the additional evidence does not raise doubts as to the reliability of Dr. Kamin's opinion."). In this case, Dr. Eurenius did not deny that Plaintiff had some condition that was causing him to feel tingling and numbness, but rather, he stated only that the symptoms were of "uncertain etiology." (470). More importantly, regardless of the cause of the symptoms, Eurenius found that Plaintiff still had full use of his hands. (470).

In sum, Plaintiff has not shown that the ALJ's RFC determination was erroneous.

### *The Credibility Determination*

Plaintiff next contends that the ALJ's credibility determination, in addition to being incorrect with regard to his ability to use his hands, was also incorrect in other ways.[17] First, Plaintiff maintains that the ALJ erred in finding that his daily activities, such as shoveling snow, digging holes for shrubbery, and hanging drywall, suggested that he was capable of full-time work. Although Plaintiff admits that he performed those tasks, he claims that such fact is not indicative of his ability to work on a regular and continuing basis, since they were "isolated incidents over the course of years."[18]

However, the Court does not agree with Plaintiff's characterization of the record as showing that his engagement in strenuous physical activities amounts to "isolated incidents over the course of years." Rather, the record indicates that Plaintiff consistently engaged in such activities, even well after his last-insured date. In addition

---

[17]Pl. Memo of Law [#9-1] at p. 15.

[18]Pl. Memo of Law [#9-1] at pp. 16-17. Plaintiff also suggests that the ALJ failed to consider that he suffered pain as a result of performing those activities. However, the ALJ noted that Plaintiff experienced soreness after performing such activities. (35).

to the activities that the ALJ specifically noted (raking, filling barrels, digging holes for bushes, hanging drywall, hiking),[19] Plaintiff continued to engage in activities such as digging sod (532), sanding (731), raking/carrying leaves for "3+" hours (765), stacking wood (779) and training a therapy dog (77-80, 488).  It was not improper for the ALJ to reason that Plaintiff's ability to perform such tasks, even on a part-time basis, suggested that he was also able to engage in the less-strenuous requirements of light/sedentary work. *See, Batchelder v. Astrue*, No. 10-CV-00267 MAD, 2011 WL 6739511, at *10 (N.D.N.Y. Dec. 23, 2011) ("The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. . . .  Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ correctly applied the standard, enumerated in 20 C.F. R. § 404.1529(c)(3) (i)-(iv), in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities, *i.e.*, her work as a visiting home nurse (performed 10-18 hours per week) and found that, her reported activities are much more demanding than the minimal demands of sedentary work activity".) (citations and internal quotation marks omitted).

Finally, Plaintiff contends that the ALJ's credibility determination was erroneous insofar as it was based on the "conservative" nature of Plaintiff's treatment.[20]  Plaintiff avers that the ALJ's consideration of the treatment that he received "cannot form a

---

[19]*See*, (35).

[20]Pl. Memo of Law [#9-1] at p. 17 ("The ALJ also put significant focus on what he purported  to be conservative treatment with mainly physical therapy and pain medication.").

legitimate basis for a credibility determination."[21]  In this regard, Plaintiff contends that the ALJ "improperly played doctor" by suggesting that he should have pursued "more advanced treatment modalities," or that he unfairly penalized Plaintiff for not pursuing such treatments.[22]  Plaintiff essentially argues that he pursued the treatments that were recommended by his doctors, and that he should not be penalized for doing so.[23]

However, the ALJ did not commit error either by considering the treatment that Plaintiff received, as part of his credibility determination, or by characterizing such treatment as "conservative."  To begin with, the ALJ did not err by referring to Plaintiff's treatment as "conservative," because Dr. Evans also used that term to describe Plaintiff's treatment. (547, 593).  In any event, it is not necessarily improper for an ALJ to describe the claimant's treatment as "conservative" where the record supports such a characterization.  *See, Knorr v. Colvin*, No. 6:15-CV-06702(MAT), 2016 WL 4746252, at *14 (W.D.N.Y. Sept. 13, 2016) (Characterizing "physical therapy, a TENS unit, NSAIDs, opioid analgesics, muscle relaxants, anti-convulsant medications, palliative injections, [and] chiropractic adjustments" as "conservative treatments.").

---

[21]Pl. Memo of Law [#9-1] at p. 18.

[22]Pl. Memo of Law [#9-1] at pp. 17-18.

[23]Plaintiff argues that "the alternative to conservative treatment -- surgical treatment -- was not an option for [him]." Pl. Memo of Law [#9-1] at p. 18.  In that regard, Plaintiff maintains that it was unfair for the ALJ to refer to the "fairly conservative" nature of his treatments, because Dr. Maxwell "stated that the only surgical option to address Plaintiff's neck pain and cervical radiculopathy would be a complete fusion of the neck," which he "did not think was a wise course of action."  However, Dr. Maxwell opined that Plaintiff's hand symptoms were most likely due to carpal tunnel syndrome, which, if true, "would be an easy thing to fix," surgically. (596) (Indicating that new "electrical studies" might show that Plaintiff's condition had "blossom[ed] into a true carpal tunnel.").  Alternatively, Dr. Maxwell indicated that if the hand symptoms were caused by problems in the neck, then surgery was not a good option.  However, just two months after this visit with Dr. Maxwell, Plaintiff reportedly indicated to a different doctor that he was having only "rare numbness in his hands." (856, 869).

Moreover, the ALJ did not err by observing that the "fairly conservative" nature of the treatments that Plaintiff received was inconsistent with his "complaints of disabling chronic pain" (35),[24] because ALJs are expressly directed to consider the treatment that a claimant has received when evaluating the claimant's credibility. *See*, 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . Treatment, other than medication, you receive or have received for relief of your pain or other symptoms[.]").

Further, the ALJ did not suggest that Plaintiff should have pursued "more advanced treatment modalities," rather, he noted that Plaintiff's doctors had not recommended such treatments. (35) ("Despite complaints of disabling chronic pain, the longitudinal record prior to the date last insured shows the claimant's musculoskeletal conditions were managed fairly conservatively, with only physical therapy and pain medication[.] . . . There is no indication the claimant's treating sources prescribed any assistive devices such as a cane, or pursued more advanced treatment modalities, such as injections, to address the claimant's pain.").

For all of the foregoing reasons, Plaintiff's arguments concerning the ALJ's credibility determination lack merit.

---

[24]It should be noted, in that regard, that the ALJ was apparently referring more to Plaintiff's lower-back symptoms than to his hand symptoms, since Plaintiff usually did not complain of "pain" associated with his hands, but usually complained of numbness and tingling.  In fact, immediately prior to Plaintiff's last-insured date, PA Barone noted that Plaintiff did not have any pain associated with his hands. (507); *but see*, (526, 532) (alluding to hand pain).

CONCLUSION

Plaintiff has not shown that the Commissioner's decision should be reversed.

Accordingly, Plaintiff's application [#9] for judgment on the pleadings is denied,

Defendant's cross-motion [#12] is granted, and this action is dismissed.

So Ordered.

Dated: Rochester, New York          ENTER:
      March 16, 2018

                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge